925 F.Supp. 1292 (1995)
UNITED STATES of America, Plaintiff,
v.
STATE OF TENNESSEE, Don Sundquist, Governor of the State of Tennessee; Marjorie Nelle Cardwell, Commissioner, Tennessee Department of Mental Health and Mental Retardation; Max Jackson, Superintendent, Arlington Developmental Center, Defendants.
People First of Tennessee, on behalf of its members,
Carl Beard, by his next friend Wendy Kurland,
Sandra Howard, by her next friend Elizabeth Henderson,
Herman Walter Runions, by his next friend Sarah R. Todd,
Harvey Richard Watson, by his next friend Jodie Wheeler,
Clarence Wilson, by his next friend Wilma Williamson,
Keith Collins, by his mother and next friend, Joyce Cisco,
Stevelyn Danieal Tucker, by her parents and next friends, Carolyn and Steve Tucker,
Parent-Guardian Association of Arlington Developmental Center, Intervenors.
No. 92-2062-M1.
United States District Court, W.D. Tennessee.
November 6, 1995.
*1293 *1294 *1295 Verlin Hughes, William Maddox, Robert Bowman, Laurie Weinstein, U.S. Department of Justice, Special Litigation Section, Washington, D.C., for Plaintiff.
Earle Schwarz, Waring Cox, Memphis, TN, Edward Connette, Lesesne & Connette, Charlotte, NC, Jack Derryberry, Ward, Derryberry & Thompson, Nashville, TN, Judith Gran, Frank Laski, Public Interest Law Center of Philadelphia, Philadelphia, PA, William F. Sherman, Law Offices of William F. Sherman, Little Rock, AR, Kimberly Dean, Office of the Attorney General, Nashville, TN, Kathleen Maloy, Office of the Attorney General, Nashville, TN, for Defendants.
ORDER ON DEFENDANTS' COMPLIANCE WITH EMERGENCY PROVISIONS AND ON DEFENDANTS' MOTIONS TO FIND PARTIAL COMPLIANCE AND LIFT SANCTIONS
McCALLA, District Judge.

INTRODUCTION
This case is before the Court for a determination regarding compliance by the State of Tennessee, Governor Sundquist, Commissioner Cardwell, and Superintendent Jackson with the provisions of the Emergency Order of June 30, 1995 (hereinafter "Emergency Order"), and the Preliminary Injunction of July 10, 1995 (hereinafter "Preliminary Injunction") (also hereinafter "Orders"). The question of compliance arises in the context of a contempt finding by the Court at a hearing on August 9, 1995, regarding five provisions of the Orders. Contempt Order, docketed August 24, 1995. Since that finding, defendants have filed two motions for a determination of partial or complete compliance as to four provisions of the Orders.
Because the context in which the Orders and the contempt finding arose is important for determining whether or not the defendants are now in compliance (i.e. have purged themselves of contempt), and because a discussion of the factual background of the contempt finding and a thorough discussion of the proof presented at a hearing on October 10-11, 1995, may be beneficial to all the parties in framing their future responses and to the defendants in conforming their conduct to achieve compliance, the matters before the Court will be discussed in some detail. Factors of importance in resolving the issues before the Court include: (1) the degree of participation by the State of Tennessee in formulating the remedial provisions, and (2) the effort (or lack of effort) demonstrated by the State of Tennessee in *1296 attempting to achieve the specific provisions of the Orders.
Set out below are: (1) how the case and this issue arose, (2) the State of Tennessee's history of noncompliance, (3) the applicable law, (4) the positions of the parties, the evidence presented on October 10, 1995, and the Court's findings regarding the effect of sanctions, and (5) the Court's findings regarding purgation of contempt, compliance/noncompliance with the remedial provisions of the Emergency Order and Preliminary Injunction, and appropriate future remedial sanctions.

I. BACKGROUND  HOW THE CASE AND THIS ISSUE AROSE
The Arlington Developmental Center is a state operated, residential mental retardation facility housing 383[1] developmentally disabled persons located in Arlington, Tennessee. ADC's population consists primarily of individuals currently assessed as severely or profoundly retarded or developmentally disabled, some of whom have associated physical handicaps, and mental or behavioral problems. ADC is an Intermediate Care Facility for the Mentally Retarded ("ICFMR"). The federal government pays sixty-six per cent of the costs of operation of this facility, with the State of Tennessee paying the remaining thirty-four per cent.[2] Tr., Hr'g, April 10, 1995, at 153-154.
The United States and the State of Tennessee have been in dispute regarding conditions at ADC since 1990. In 1991, the United States Department of Justice ("DOJ"), as part of an investigation of possible statutory and constitutional violations concerning the resident population at ADC, issued a findings letter citing deficiencies to the State of Tennessee. The State of Tennessee refused to correct the deficiencies cited in the DOJ findings letter. On January 21, 1992, the United States filed this action against the State of Tennessee and Arlington Developmental Center, pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. §§ 1997-1997j (1988).
The trial of this case took place over a two month period beginning on August 30, 1993. On November 22, 1993, the Court issued an oral opinion and, on February 18, 1994, filed Supplemental Findings of Fact. For the additional procedural and factual history of this case, see Contempt Order, docketed August 24, 1995, at 1-16. In the oral opinion and Supplemental Findings, the Court held that conditions at ADC were in violation of the rights of its residents under the United States Constitution. See Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).[3]
*1297 Concurrent with the oral ruling of November 22, 1993, the Court entered a preliminary injunction and established a schedule for submittal of a remedial plan by the State of Tennessee. As a result of that procedure, the United States and the State of Tennessee negotiated a plan to remedy the unconstitutional conditions at ADC. On September 2, 1994, the parties submitted a Stipulated Remedial Order to settle the case. As part of the settlement, the United States and the State of Tennessee agreed to the appointment of a Monitor to assist and oversee the State's compliance with the agreed-upon remedial plan. The Court, with the concurrence of both parties, appointed Linda R. O'Neall, Ph.D., to perform that function.[4]

II. HISTORY OF NONCOMPLIANCE
The Remedial Plan negotiated by the State of Tennessee contains a "schedule of implementation" setting out the timeframes in which each of the remedial actions agreed to by the State was to be completed.[5] A large number of items were to be commenced within the first ninety days of implementation of the plan. Accordingly, the Monitor conducted the First Semi-Annual Compliance Review at ADC from November 28, 1994, through December 2, 1994. Based on this review, the Monitor issued a compliance report to the parties on March 9, 1995. The report then went through a comment and response period and was ultimately the subject of a compliance hearing on April 10, 1995.
At the April 10, 1995, hearing, the Court determined that the State had achieved full compliance with only five of the sixty-five self-imposed deadlines within the first ninety day period. In anticipation of this finding of noncompliance, the State, after negotiation with the United States, proposed a "Plan of Correction" that was submitted to the Court as Exhibit 6 to the hearing of April 10, 1995. The introduction to the Plan of Correction submitted by the State of Tennessee provided as follows:
The Monitor's First Semi-Annual Compliance Review identified a number of areas in which the defendants have failed to achieve full compliance with the provisions of the Remedial Order, in particular, with respect to the areas of protection from harm, seizure management, and feeding/nutritional management. In order to appropriately prioritize and focus the corrective remedial measures to be taken by the defendants, the following Plan of Correction has been developed.
Plan of Correction, Ex. 6, Hr'g, April 10, 1995.
The Plan of Correction supplements the Stipulated Remedial Order and, like the Remedial Plan, also contains a schedule for completion of specific actions. For example, under the individual case management section relating to seizure management, nurses were to be assigned individual resident case-loads by no later than April 20, 1995. Additionally, *1298 under paragraph II.C. of the Plan of Correction, the State of Tennessee was to have 136 nursing positions "on staff" by July 1, 1995. Plan of Correction, Ex. 6, ¶ II.C., Hr'g, April 10, 1995. In that regard, the State made the following commitment:
Defendants will make ongoing efforts to fill these positions with Arlington nurse employees, rather than contract nurses.
Id. (emphasis supplied). At the April 10, 1995, hearing, Linda Ross, an Assistant Attorney General for the State, asked Gaye A. Hansen, the State Facilitator of the Remedial Order at ADC, the following clarifying question regarding paragraph "II.C.":
Q. Subparagraph C, nurse staffing, would you  what is the status of the 136 nursing positions?
A. Right. Well, although the plan of correction indicates that they will have approval on those positions by April the 14th, 1995, Arlington has, in fact, received approval on those provisions, got that approval at the end of last week, so they can now immediately pursue the hiring of qualified nurses. That would be inclusive of LPNs and RNs in order to fill those slots. In the interim, they will fill them with agency nurses, contract nurses, but it is understood that contract nurses will not be assigned case loads of persons with seizure disorders; that they will use full-time nurses for that purpose.
Tr., Hr'g, April 10, 1995, at 68 (emphasis supplied).
Additionally, on April 10, 1995, the State represented to the plaintiff and to the Court that:
We do have at this time a verbal agreement with a developmental disability physician with a June 1 start date.
Id. at 29 (Gaye A. Hansen, Facilitator of the Remedial Order at ADC). Ms. Hansen testified that "I ... feel that this plan of correction has a great chance for success." Id. at 81. The new deadline for retention of a developmental medicine physician and the Plan of Correction[6] proposed by the State of Tennessee were accepted by the Court.
However, the record supports the conclusion that, between April 10, 1995, and June 30, 1995, the State abandoned its goal of achieving compliance with its own Stipulated Remedial Order and its own Plan of Correction. The State effectively ceased its efforts to obtain a developmental physician and recruit nurses,[7] the number of primary care physicians (including Medical Director) decreased to two (well below the minimum requirement and the number previously anticipated by the State), and conditions at ADC deteriorated even further. Tr., Hr'g, June 30, 1995, at 7-22; Contempt Order, docketed August 24, 1995, at 6-7.
Several patient deaths and the second compliance inspection by the Monitor and her Developmental Medicine Expert on June 27-30, 1995, led the United States and the Monitor to request an Emergency Order on June 30, 1995. The United States and the Monitor requested that the order require the State to rectify certain fundamental services which it had allowed to deteriorate between April 10, 1995, and June 30, 1995, and require the State to employ within the near *1299 future certain professional staff, mandated by the Remedial Order and the Plan of Correction. The State acknowledged that the facts constituting an emergency existed, and agreed to the Emergency Order requirements.[8] Tr., Hr'g, June 30, 1995, at 3, 15-16, 30. During the June 30, 1995, telephone hearing, the State of Tennessee declared that it "had no quarrel with the wisdom of what was being suggested," since in "virtually all instances ... [the State has] begun to take steps to put those measures in place." Id. at 15.
A hearing to determine whether the emergency continued to exist and whether the State was in compliance with the Emergency Order resulting from the June 30, 1995, telephone conference was scheduled for July 10, 1995. At that hearing it was established that the State was not in compliance with the Emergency Order. Moreover, in contrast to Ms. Hansen's April 10, 1995, testimony regarding a "great chance of success," Tr., Hr'g, April 10, 1995, at 81, Commissioner Cardwell offered the following testimony regarding her July 5, 1995, conversation with Governor Sundquist:
Q. And could you inform the Court what the context  what was discussed in that in terms of what is going to be done about Arlington, what the governor's position is and what actions are going to be taken?
A. The governor is very anxious to know whether or not Arlington can be fixed and the governor would like to know what our plans are for the future.
Q. What in response to those two questions did you answer to the governor?
A. I told him I was not sure of the first one, as to whether or not Arlington could be fixed.

Tr., Hr'g, July 10, 1995, at 101 (Commissioner Cardwell) (emphasis supplied).
At the end of the July 10, 1995, hearing, additional time to achieve compliance with the Emergency Order and Preliminary Injunction provisions was granted, and a compliance hearing was scheduled for August 9, 1995. At the hearing on August 9, 1995,[9] *1300 clear and convincing proof was presented by the United States that the State of Tennessee still was not in compliance with five of the provisions of the Emergency Order and Preliminary Injunction. The United States insisted, in closing argument, that the State of Tennessee be found in contempt based on its failure to comply with remedial provisions to which it had agreed. The United States left the sanctions to be imposed to the discretion of the Court.
Based on the evidence presented on August 9, 1995, it was uncontrovertible that the State was not in compliance and had failed to perform as it had agreed. Moreover, the State admitted that it did not even have a current plan to implement the various remedial provisions to which it had agreed. Tr., Hr'g, August 9, 1995, at 46 11. 15-19 (Commissioner Cardwell). The Court, therefore, found the State in contempt and ordered minimal coercive and remedial sanctions to assure that the State would accomplish the five emergency provisions which were agreed to on June 30, 1995, but which had not been achieved by the State. Contempt Order, docketed August 24, 1995.
The financial sanction imposed was, to some degree, symbolic[10] (one thousand dollars ($1,000.00) per day per violation) since the ADC budget is relatively large and sixty-six (66) percent of that budget is federally funded. Tr., Hr'g, April 10, 1995, at 190 11. 2-4 (Durbin); Tr., Hr'g, April 10, 1995, at 154 11. 3-5 (Martins); see note 2 supra. To directly address emergency matters, a coercive sanction, therefore, was imposed on the Tennessee Commissioner of Mental Health and Mental Retardation. Specifically, the Commissioner was required to spend every fourth weekend at ADC until the State was in full compliance with the five emergency remedial provisions to which it had agreed on June 30, 1995, but which, as of August 9, 1995, it had not done.
On August 9, 1995, the Court found the State had failed to comply with the following five paragraphs: paragraph 1 (retention of a developmental physician), paragraph 2 (performance of duties of a developmental physician), paragraph 5 (retention of a full-time psychiatrist), paragraph 7 (entry by Arlington Developmental Center into contracts with two developmental nurse consultants), and paragraph 8 (hiring of 136 nurses as set out in the April 10, 1995, Plan of Correction).[11]

III. APPLICABLE LAW

A. CIVIL CONTEMPT
Federal courts have inherent powers to assure the administration of justice. See United States v. Hudson, 11 U.S. (7 Cranch) 32, 3 L.Ed. 259 (1812). The most prominent among these inherent powers is the contempt sanction, "which a judge must have and exercise in protecting the authority and dignity of the court...." Roadway Express v. Piper, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (quoting Cooke v. United States, 267 U.S. 517, 539, 45 *1301 S.Ct. 390, 395-96, 69 L.Ed. 767 (1925)). "[T]he power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law." Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 450, 31 S.Ct. 492, 501, 55 L.Ed. 797 (1911); see also 18 U.S.C. § 401 (1988) ("A court of the United States shall have the power to punish, by fine or imprisonment, at its discretion, such contempt of its authority ... [as] [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command").[12] Civil contempt is the power of the court to impose sanctions to coerce compliance with its orders.[13]Hicks v. Feiock, 485 U.S. 624, 632, 108 S.Ct. 1423, 1429-30, 99 L.Ed.2d 721 (1988); Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); Gompers, 221 U.S. at 442, 31 S.Ct. at 498. Both imprisonment and fines, when coercive or conditional, are legitimate civil contempt sanctions. See, e.g., Shillitani, 384 U.S. at 370, 86 S.Ct. at 1535 (imprisonment); United States v. Bayshore Assoc., Inc., 934 F.2d 1391, 1400 (6th Cir. 1991) (fines).

B. PURGING CONTEMPT

1. What Is It and What Is Its Purpose?
Once subject to contempt for failure to comply with a court order, the contemnor must be afforded an opportunity to purge itself of the contempt. International Union, United Mine Workers of Am. v. Bagwell, ___ U.S. ___, ___, 114 S.Ct. 2552, 2558, 129 L.Ed.2d 642 (1994); Shillitani, 384 U.S. at 371, 86 S.Ct. at 1536. Compliance with that court order will purge the contempt and free the contemnor from coercive sanctions.[14]See Bayshore Assoc., 934 F.2d 1391, 1400 (6th Cir.1991) ("[O]nce the defendant performs the act required by the court, he must be released"). The determination of compliance, like all decisions relating to contempt, is at the discretion of the court. See Peppers v. Barry, 873 F.2d 967, 968 (6th Cir.1989); National Labor Relat. Bd. v. Aquabrom, Division of Great Lakes Chemical Corp., 855 F.2d 1174, 1187 (6th Cir.1988) ("The only limitation [on a court's contempt power] is that in a civil proceeding, the sanctions must not be penal in nature, but must be coercive or remedial"). In making its determinations on compliance and the appropriateness of continued contempt sanctions, a court should be guided by the remedial purpose of contempt. See Aquabrom, 855 F.2d 1174, 1187 (6th Cir.1988) ("[The court's power to coerce actions to purge contempt is] the power of a court to grant the relief that is necessary to effect compliance with its decree. The measure of the [c]ourt's power in civil contempt proceedings is determined by the requirements of full remedial relief") (citing *1302 McComb v. Jacksonville Paper Co., 336 U.S. 187, 193, 69 S.Ct. 497, 500-01, 93 L.Ed. 599 (1949)).

2. Standard for Judging Compliance
The Sixth Circuit test for judging compliance is whether the contemnors "took all reasonable steps within their power to comply with the court's order." Glover v. Johnson, 934 F.2d 703, 708 (6th Cir.1991) (quoting Peppers, 873 F.2d at 969). Precisely what "all reasonable steps within [the contemnor's] power" are varies from case to case according to the requirements of the order and the particular circumstances of the case. In every case, however, a contemnor must have the ability to comply with the order before failure to comply can form the basis of contempt.[15]McNeil v. Director, Patuxent Institution, 407 U.S. 245, 251, 92 S.Ct. 2083, 2087-88, 32 L.Ed.2d 719 (1972); Maggio v. Zeitz, 333 U.S. 56, 72, 68 S.Ct. 401, 409, 92 L.Ed. 476 (1948). Other than a showing of the impossibility of compliance, nothing short of substantial compliance, as measured under the Peppers test, will suffice to purge contempt for noncompliance with a court order. The Sixth Circuit has explicitly rejected the contention that a good faith effort is sufficient, Peppers, 873 F.2d at 968, TWM Mfg. Co. v. Dura Corp., 722 F.2d 1261, 1273 (6th Cir.1983), and has not adopted the less demanding diligent efforts test favored in other circuits.[16]
Courts have been particularly unsympathetic to purported excuses for less-than-substantial compliance where the contemnor has participated in drafting the order against which compliance is measured. See, e.g., Glover, 934 F.2d at 708-09 (finding state prison officials in contempt for failing to abide by order consisting of negotiated settlement between the parties); see also Spallone v. United States, 493 U.S. 265, 276, 110 S.Ct. 625, 632-33, 107 L.Ed.2d 644 (1990) (upholding finding of contempt against city that had failed to take action required by consent decree). A party participating in drafting an order does so with an understanding of what it reasonably can accomplish. When that party subsequently fails to live up to the particulars of the order, it is more difficult for a court to excuse that failure than if the order had been court imposed.

C. CONTEMPT SANCTIONS FOR NONCOMPLIANCE WITH A COURT ORDER

1. Options Available to the Court
Once a contemnor has been found in noncompliance, such that contempt is not purged, the court has the option of continuing the sanctions already in place or imposing new sanctions determined to be more effective in carrying out the underlying remedial purpose. This choice, like all decisions relating to contempt sanctions, is at the court's discretion. See Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 15, 91 S.Ct. 1267, 1275-76, 28 L.Ed.2d 554 (1971). *1303 The range of sanctions available to courts include fine, imprisonment, receivership, and a broader category of creative, non-traditional sanctions. See 42 U.S.C. § 401 (1988) (authorizing "fine or imprisonment"); Hicks, 485 U.S. at 632, 108 S.Ct. at 1429-30 (fines and imprisonment); Shillitani, 384 U.S. at 370-71, 86 S.Ct. at 1535-36 (imprisonment); Gompers, 221 U.S. at 441, 31 S.Ct. at 498 (fines and imprisonment); Reed v. Rhodes, 642 F.2d 186 (6th Cir.1981) (receivership and appointment of judicial administrator); Glover v. Johnson, 934 F.2d 703, 707-15 (appointment of a special administrator, which was not among the "traditional civil contempt sanctions"). The choice of a sanction also necessitates a decision on how severe that particular sanction should be.

2. Determining Contempt Sanctions  Selection and Severity
There are two guiding principles for the selection of civil contempt sanctions. First, the sanction must be coercive or remedial rather than punitive. National Labor Relat. Bd. v. Aquabrom, Division of Great Lakes Chem. Corp., 855 F.2d 1174, 1187 (6th Cir.1988). The contemnor is not simply being punished for past behavior, but rather encouraged to shape its behavior to comply with the order based on the undesirability of suffering the sanction. The goal of sanctions, then, is to coerce the contemnor to act in such a way that the remedial purposes of the order are furthered. When using civil contempt in such a way, the court "must then consider the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." United States v. United Mine Workers of Am., 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). Second, particularly when imposing sanctions against state officials, the court should select the least intrusive sanction that the court determines will coerce the contemnor to comply. Spallone v. United States, 493 U.S. 265, 276, 110 S.Ct. 625, 632-33, 107 L.Ed.2d 644 (1990); Kendrick v. Bland, 740 F.2d 432 (6th Cir.1984). In any given case, there may be many sanctions that will coerce compliance and further the remedial purpose of the order, but a court does not automatically impose the most severe and intrusive. There are two competing concerns in this determination: intrusiveness and effectiveness. Determining the relative intrusiveness of different possible sanctions in a particular case is a common sense inquiry. See, e.g., Hutto v. Finney, 437 U.S. 678, 691, 98 S.Ct. 2565, 2573-74, 57 L.Ed.2d 522 (1978) (noting that a fine is a less intrusive sanction than imprisonment); Glover v. Johnson, 855 F.2d 277, 287 (6th Cir.1988) (suggesting that, while the court's appointment of a judicial administrator in the instant case was too intrusive, using a court monitor to enforce its orders would be permissible); Reed v. Rhodes, 642 F.2d 186 (6th Cir.1981) (approving the appointment of an administrator to oversee compliance with court order but disapproving receivership as too intrusive in the instant case). Determining what sanctions will be effective to coerce compliance involves a court's discretion and judgment based on an understanding of the case and the contemnor, particularly with respect to the nature of prior noncompliance.
Given that contempt sanctions are within a court's discretion and that there is no simple formula for assigning a particular sanction to a given case, a court clearly can consider a contemnor's history of compliance or noncompliance in shaping an appropriate contempt sanction. Compare Glover v. Johnson, 934 F.2d 703, 715 (6th Cir.1991) (noting that a "persistent pattern of obfuscation, hyper-technical objections, delay, and litigation by exhaustion on the part of the defendants to avoid compliance with the letter and spirit of the district court's orders" made the sanction of appointing an administrator justified where it had been found too intrusive three years earlier) with Glover v. Johnson, 855 F.2d 277, 287 (6th Cir.1988). While there is no intent requirement for civil contempt, the issue of the contemnor's willfulness in not complying with court orders may be taken into consideration in determining the extent of the contempt sanction. TWM Mfg. Co. v. Dura Corp., 722 F.2d 1261, 1273 (6th Cir.1983); Rogers v. Webster, 776 F.2d 607, 612 (6th Cir.1985). The contemnor's relative intent clearly is relevant in *1304 gauging how severe a sanction is necessary in a given case. See United States v. United Mine Workers of Am., 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947) ("[The court] must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired"); see also United States v. Work Wear Corp., 602 F.2d 110, 116 (6th Cir.1979) (upholding the district court's denial of a motion to reduce a civil contempt fine  despite the government's recommendation for reduction  where the contemnor had made a "conscious business decision" not to comply, even though the district court had granted an extension to give the contemnor time to come into compliance). When a contemnor's noncompliance has been based in part on conscious decisions to take less than "all reasonable steps within their power to comply," a court clearly would be entitled to take such into consideration in shaping contempt sanctions.

IV. THE OCTOBER 10-11, 1995, HEARING

A. POSITIONS OF THE PARTIES
On October 10-11, 1995, the Court held a hearing on defendants' compliance with the remedial provisions of the June 30, 1995, Emergency Order and July 10, 1995, Preliminary Injunction. See Appendices 4, 5. Prior to the commencement of the hearing, defendants filed two motions for findings of partial compliance. Defendants' Motion for Finding of Partial Compliance, docketed August 18, 1995; Defendants' Second Motion for Finding of Partial Compliance, docketed August 25, 1995. In their initial motion for finding of partial compliance, defendants asserted that they were now in compliance with paragraphs 5 and 8. Specifically, defendants asserted that they had retained a full-time psychiatrist as of August 14, 1995, and were, as of that date, in full compliance with paragraph 5. See Compliance Table, Appendix 7. Regarding compliance with paragraph 8, the defendants, in their first motion, asserted that as of August 11, 1995, 136 nurses were on the ADC payroll and that, therefore, they were in compliance with that provision.
In their second motion for a finding of partial compliance, defendants asserted that they were in compliance with paragraphs 1 and 7 of the Emergency Order and Preliminary Injunction and that compliance was achieved on July 21, 1995. Specifically, defendants asserted that effective July 21, 1995, they had retained the services of Dr. Ricardo Causo, a Developmental Medicine Physician, and that effective August 23, 1995, ADC had executed consulting contracts with two developmental nurses as required under paragraph 7. Defendants concede that they have not complied with paragraph 2 of the Emergency Order and Preliminary Injunction. See Appendices 4, 5 (¶ 2, Duties of Developmental Physician); see Compliance Table, Appendix 7. Defendants asserted that they were in compliance with all other provisions of the Emergency Order and Preliminary Injunction.
At the outset of the October 10-11, 1995, hearing, the United States agreed that the defendants were in compliance with paragraphs 5 (full-time psychiatrist) and 7 (two developmental nurse consultant contracts). The United States took the position that defendants were not in compliance with paragraphs 1 (Developmental Medicine Physician) and 2 (Duties of Developmental Medicine Physician) and that there were questions regarding the date or fact of compliance with paragraph 8 (136 nurses). The United States also urged that the defendants had not purged themselves of contempt and, because of the defendants' history of failing to perform absent imposition of sanctions, the remedial and coercive sanctions imposed in the August 9, 1995, Contempt Order remained necessary in order to compel compliance. Tr., Hr'g, October 11, 1995, at 238-241.
The intervenor class representative, People First, agreed with the United States that the defendants were not in compliance with paragraphs 1, 2, and 8, and that the defendants were in compliance with paragraphs 5 and 7. Regarding paragraph 8, the intervenor People First argued that the plain language of the April 10, 1995, Plan of Correction, as adopted in the June 30, 1995, Emergency Order and the July 10, 1995, *1305 Preliminary Injunction required that the defendants "hire to the capacity of 136 nurses as called for by the Plan of Correction...." Emergency Order, June 30, 1995, ¶ 6. Intervenor People First argued that the language is unambiguous and does not provide for the use of agency or contract nurses. Intervenor People First urged the Court to establish a nurse turnover goal (to reduce turnover to five percent) and a constant caseload requirement, pursuant to paragraph 12 of the Preliminary Injunction. Tr., Hr'g, October 11, 1995, at 242-243.
The intervenor Parent-Guardian Association took no position regarding compliance and urged that any sanction imposed be crafted so as not to adversely affect employee morale at ADC. Tr., Hr'g, October 11, 1995, at 244-246.

B. EVIDENCE PRESENTED ON OCTOBER 10, 1995
The State of Tennessee called seven witnesses[17] and introduced twenty-eight exhibits at the October 10, 1995, hearing. The United States called only one witness, Commissioner Cardwell. A discussion of the testimony and exhibits follows.

1. Grunow
Barbara Grunow, Director of Human Resources Development for the Tennessee Department of Mental Health and Mental Retardation, testified that she is responsible for "overall assistance to our ten facilities with recruitment for our professional staff persons, and most of all our ... health care professionals." Tr., Hr'g, October 10, 1995, at 12. Ms. Grunow has "responsibility for identifying issues that are relevant to retention of those individuals [i.e., health care professionals]." Id.
Ms. Grunow became actively involved with recruitment activities at ADC in July 1995. Id. at 23. Since that time, she has been involved in the recruitment of developmental physicians, physical therapists, and nurses. Id. at 12-27. Her specific activities have included the placement of advertisements in six physician's journals for the position of developmental physician (advertisements were to run in September and October 1995), recruiting for a developmental physician at the American Academy for Cerebral Palsy and Developmental Medicine (September 28-30, 1995), and contacting medical school developmental medicine departments. Additionally, during the first week of October 1995, she prepared an analysis of benefits available to developmental physicians through employment with either the State of Tennessee or the University of Tennessee ("UT").[18]Id. at 24-25.
Grunow's duties since July 1995 have included "assistance in receiving or obtaining confirmation on the licensure of [physicians] to practice in Tennessee." Id. at 18. Ms. Grunow testified that, of the three developmental physicians under contract from Columbus Medical Services to provide developmental medicine services at ADC, only two physicians (Dr. Compart and Dr. Rogers) have now completed licensure. The third, Dr. Hayes, is not licensed in Tennessee and has not provided the information necessary in order to complete the licensure application. Id. at 20.
Ms. Grunow testified that, in connection with the recruitment of two developmental nurses, she placed classified advertisements in five Tennessee newspapers on August 17, 1995.[19]

*1306 2. Womack

Patricia Louise Womack, an administrative services assistant with the Department of Mental Health and Mental Retardation, testified that she was responsible for assisting ADC with the recruitment of nurses (licensed practical nurses ("LPNs"), registered nurses ("RNs"), and developmental disability nurses). Tr., Hr'g, October 10, 1995, at 29. Since July 5, 1995, Ms. Womack has been stationed at ADC. Ms. Womack has been involved in many of the same activities as Ms. Grunow. Ms. Womack reported that, as of October 9, 1995, ADC had hired one developmental disabilities nurse, Mariah Kurlick. Id. at 32; Ex. 3, Hr'g, October 10, 1995.
Ms. Womack also testified regarding the number of nurses to be employed at ADC pursuant to the Plan of Correction as follows:
Q. Are your familiar with the nursing number requirements established at Arlington Developmental Center?
A. Yes, ma'am.
Q. And what are those nursing number requirements?
A. There is a requirement for 136 nurses to be employed at Arlington, comprised of RNs, LPNs, and staff nurses.
Tr., Hr'g, October 10, 1995, at 32.
Ms. Womack testified regarding three categories of nurses utilized at ADC: state employees, contract employees, and agency nurses.[20] Until August 11, 1995, the State of Tennessee regarded Med Temps nurses as agency nurses.[21]Id. at 35. On September 15, 1995, ADC unilaterally changed the characterization of Med Temps nurses from agency nurses to "contract nurses."[22]Id. at 35. While Ms. Womack testified that the State was in compliance with the number of nurses required by the Plan of Correction, she acknowledged that it was her "assumption" that all three categories of nurses (employee, contract, and agency) could be counted for *1307 the purposes of determining compliance. Id. at 50 1. 7. Significantly, Ms. Womack was not present at ADC until well after the State's submission of the Plan of Correction and the entry of the Emergency Order. Id. at 35.
Exhibit 4, an ADC Nursing Status Report generated by the State, was introduced through Ms. Womack. Id. at 37; see Appendix 2 (Summary pages from Exhibit 4 for the period August 11, 1995, to October 4, 1995). Exhibit 4 reflects that 136 nursing positions were allocated for ADC and ninety-two of those positions had been filled as of August 10, 1995. Additionally, seventeen contract nurses and twenty-seven agency nurses were providing services at ADC, bringing the total nursing staff to 136. Ms. Womack confirmed that as of October 10, 1995, the State had not analyzed the turnover among contract and agency nurse positions at ADC. Additionally, Ms. Womack confirmed that ADC had not filled the position of quality assurance nurse. Tr., Hr'g, October 10, 1995, at 52. Ms. Womack also testified that, as of October 10, 1995, there were 102 state employee nurses, thirty-three contract nurses (including Med Temps nurses),[23] and sixteen agency nurses at ADC. Id. at 41.

3. Durbin
Larry Durbin, the Assistant Commissioner for Mental Retardation Services for the State of Tennessee, testified that he has overall operating responsibilities for all the State's mental retardation and developmental disabilities services. Tr., Hr'g, October 10, 1995, at 54. Dr. Durbin is primarily responsible for the State's efforts to retain a Developmental Medicine Physician. Id. at 54-55. In that regard, Dr. Durbin testified that immediately after entry of the Emergency Order he contacted Columbus Medical Services and "began negotiations to have them involved in a nationwide search for a qualified developmental disability physician." Id. at 55. He also contacted the University of Tennessee and sought to expedite their efforts to hire a recruiting firm in Atlanta, Georgia (Ward Howell). Id. On July 12, 1995, the State of Tennessee and Columbus Medical Services entered into a contract for professional search and consulting services.[24]
Dr. Durbin testified regarding the current status of recruitment efforts for a Developmental Medicine Physician, as well as the current status of the agreement with Columbus Medical Services for interim developmental medicine physician services. Id. at 56-58, 60-61. Originally, the State of Tennessee did not require in its contract with Columbus Medical Services that the Developmental Medicine Physicians supplied by Columbus be licensed to practice in the State of Tennessee. Because unlicensed physicians could not provide actual clinical treatment or practice medicine in the State of Tennessee, it was necessary for the State of Tennessee to seek an amendment of its contract with Columbus Medical Services so that the State could obtain physicians who could provide actual treatment to residents of ADC. See Tr., Hr'g, October 10, 1995, at 60-61. On October 5, 1995, almost three months after the execution of the original contract, the State and Columbus Medical Services agreed to such an amendment.[25] The amendment reads, in part, as follows:

*1308 A. Services to be provided at Arlington Developmental Center
1. Columbus Medical Services agrees to provide only DD physician consultants who are fully licensed to practice medicine in the State of Tennessee.
Ex. 7, Hr'g, October 10, 1995.

4. Akers
Phillip V. Akers, Medical Director at ADC, testified regarding the developmental medical services provided by Columbus Medical Services. Dr. Akers confirmed that on March 14, 1995, he had conducted an analysis regarding the nursing needs of ADC. Tr., Hr'g, October 10, 1995, at 108. At that time, Dr. Akers concluded that ADC's nursing needs are closer to those of an acute care facility and recommended to Dr. Durbin a full nurse compliment of 136, including nurse administrators. Id. at 108-109; Ex. 23, Hr'g, October 10, 1995. Dr. Akers' recommendation of 136 nurses was conveyed to Dr. Durbin in a March 14, 1995, memorandum. Id.; Appendix 3.
Dr. Akers also testified regarding: (1) the contracting process for emergency services; Id. at 105-106; Ex. 22, Hr'g, October 10, 1995; (2) the hospital agreements negotiated on behalf of ADC; Tr., Hr'g, October 10, 1995, at 100; Ex. 19, Hr'g, October 10, 1995; and (3) the current prohibition against use of "Do Not Resuscitate" orders at state facilities. Tr., Hr'g, October 10, 1995, at 99-100. Dr. Akers testified that Dr. Kelly Askins, a full-time psychiatrist, had been hired and a training program established for him. Id. at 85-87. Furthermore, Dr. Akers confirmed that ADC now has four primary care physicians other than himself. Dr. Akers also described their orientation and training since July 1995.[26]Id. at 88-91; Ex. 15, Hr'g, October 10, 1995.
Dr. Akers discussed the implementation of a "physician alert" form to assure communication between those physicians providing evening and early morning coverage and each resident's primary care physician. Tr., Hr'g, October 10, 1995, at 81-84; Ex. 13, Hr'g, October 10, 1995. Dr. Akers also described, in general, the increased efforts at education, disease tracking, communications, and recruitment at ADC primarily since the imposition of sanctions on August 9, 1995. Tr., Hr'g, October 10, 1995, at 78-81; see Ex. 12 (Draft, ADC Nursing Guidelines/Tracking Critical Illness, August 31, 1995), Ex. 14 (Lecture and Discussion Topics for the Period September 11-22, 1995), Ex. 16 (Physician/Staff In Service October 6, 1995), Ex. 17 (Physician/FNP Staff In Service October 9, 1995), Ex. 20 (Patient Transfer Packet/September 1995), Ex. 22 (Request to Hospitals for Discharge Summaries/September 13-29 1995), Hr'g, October 10, 1995.[27]
Dr. Akers discussed the role of Dr. Causo, a special contract developmental pediatrician who has been retained by ADC for ninety days while the State recruited a Developmental Medicine Physician with the necessary training and experience. Because Dr. Causo lacked certain training, Dr. Akers indicated that "I changed the role he was playing  we had identified at that point a list of persons proposed for transition from Arlington to the community with projected dates where they might be ready to move." Tr., Hr'g, October 10, 1995, at 70. Dr. Akers, after discussions with the UT consultants (Dr. Kube and Dr. Palmer) determined that Dr. Causo would be most useful in evaluating the group of residents that was scheduled for transition to the community.
*1309 Dr. Akers acknowledged that this role was different from the initial interim developmental medicine role envisioned for Dr. Causo. Id. at 69-72. The role initially contemplated for Dr. Causo, therefore, has been partially assumed by Drs. Palmer and Kube of the University of Tennessee and the two Columbus Medical Services developmental physicians who are licensed to practice in Tennessee.[28]Id. at 64-65, 71-73. Dr. Akers acknowledged, however, that the developmental physicians from Columbus Medical Services had not been able to attend team meetings because of scheduling problems.[29]Id. at 73-74.
Dr. Akers also testified that he met with Commissioner Cardwell on August 12, 1995, during her first remedial visit to ADC. According to Dr. Akers, during that visit, Commissioner Cardwell reviewed the deficiencies previously cited by the Monitor's Developmental Medicine Expert, Dr. Wachtel, in an effort to determine whether the asserted deficiencies in fact existed.[30] Tr., Hr'g, October 10, 1995, at 128-129. During his visit with Commissioner Cardwell on the weekend of August 12, 1995, Dr. Akers accompanied the Commissioner on a review of ADC, "[going] cottage to cottage and record to record...." Id. at 130. No reports or documents were generated by Dr. Akers as a result of either the August 11-14, 1995, or the September 8-11, 1995, visit of Commissioner Cardwell. Id. at 131.

5. Palmer
Dr. Frederick Palmer, a developmental pediatrician, the Director of the Bolling Center for Developmental Disabilities (University of Tennessee) and a UT professor of pediatrics, testified regarding his efforts to recruit a developmental physician for the position at ADC. Tr., Hr'g, October 10, 1995, at 143. Dr. Palmer described those efforts as beginning in late July 1995. Id. at 143-144. Within the last two years Dr. Palmer has recruited two developmental physicians  Dr. Kube and Dr. Peterson  for the developmental medicine program at UT. Id. at 146. Dr. Palmer assisted in Dr. Causo's orientation, and provides continuing supervision for Dr. Causo at ADC. Id. at 147.

6. Askins
Dr. Kelly Marsh Askins, a board eligible psychiatrist and an employee of ADC as of August 14, 1995, also testified. Tr., Hr'g, October 10, 1995, at 157-158. He confirmed his date of employment and the orientation and training that he has received since arriving at ADC. Dr. Askins will be attending a series of conferences and, perhaps, a mini-fellowship over the next several months.[31]

7. Lester
Norma J. Lester, the Director of Nursing at ADC since September 15, 1995, also testified. Ms. Lester has worked for thirty-two years primarily in institutional nursing. She testified that, as Director of Nursing at ADC, she is "primarily responsible for coordinating resources and training for the nursing staff." Tr., Hr'g, October 10, 1995, at 175. Ms. *1310 Lester identified the two developmental nurse consultant contracts that have now been entered into by ADC. Id. at 182; Ex. 28, Hr'g, October 10, 1995. Ms. Lester stated that the addition of the developmental nurse consultants has been helpful. Tr., Hr'g, October 10, 1995, at 182-183.
Based on her review of nurse training records, Ms. Lester stated that approximately eight agency nurses have not received seizure training and approximately fourteen State employee nurses have not received seizure training. Id. at 185. Ms. Lester also confirmed that she did not prepare the ADC nursing status reports contained in Exhibit 4. See Appendix 2. Regarding turnover, Ms. Lester testified as follows:
Now, in regards to the turnover, we do tend to see a fair amount of turnover. In fact, it is like today, we can't keep up with it, and I think that's for many reasons ... I have only been there for just three weeks and I have already had to terminate and reassign just in that short period of time, so  and this is an ongoing process with us.
Id. at 189-190. Ms. Lester went on to indicate that "there is always going to be a degree of turnover, but I would like to keep that down to a minimum, perhaps 5%, if that is realistic...." Id. at 190-191.

8. Cardwell
Marjorie Nelle Cardwell, the Commissioner of the Department of Mental Health and Mental Retardation, was the last witness to testify at the October 10, 1995, hearing. Commissioner Cardwell testified regarding her activities both on the weekends of August 11, 1995, and September 8, 1995. Tr., Hr'g, October 10, 1995, at 194-203. Commissioner Cardwell observed that on Saturday, August 12, 1995, "the only administrative staff that I saw [at ADC] was Dr. Akers. ..." Id. at 201. On Sunday, August 13, 1995, she met with Dr. Akers, Gaye Hansen, and Dr. Durbin at ADC.
Commissioner Cardwell indicated that on her second stay she "did pretty much the same thing again, just touching base with all units on campus. It is important, always has been important to me, particularly for those second and third shift people to know that there is a supervisor around." Id. at 202. On her second weekend, Commissioner Cardwell did not meet with Dr. Durbin or other administrators "because they were not available." Id. at 206. Regarding administrative staff working on the weekend, Commissioner Cardwell observed:
I did not ask other people to give up their weekends when they had been working steady five days a week already recruiting. I did not think it would add anything by contacting people on Saturdays and Sundays.
Id. at 211.
Regarding whether the State has an overall plan for implementation of the remedy at ADC, Commissioner Cardwell stated that "not all of the timelines have the implementation to it ... those are the parts that are not down in black and white at this point."[32], [33]Id. at 214.

C. FINDINGS REGARDING EFFECT OF SANCTIONS[34]
1. The sanctions imposed in the August 9, 1995, Contempt Order have been effective in compelling actions by the defendants in furtherance of the remedial purpose of not only the Emergency Order and Preliminary Injunction but also of the September 2, 1994, *1311 Stipulated Remedial Order and the April 10, 1995, Plan of Correction. This is particularly evidenced by the testimony of Dr. Akers and Exhibit 9 (Developmental disability consultations as of October 9, 1995), Exhibit 11 (ADC master at-risk list/current as of October 3, 1995),[35] Exhibit 12 (Draft, ADC Nursing Guideline/Tracking Critical Illness, August 31, 1995), Exhibit 14 (Lecture and Discussion Topics for the Period September 11-22, 1994), Exhibit 16 (Physician/Staff in Service October 6, 1995), Exhibit 17 (Physician/FNP Staff in Service, October 9, 1995), Exhibit 20 (Patient Transfer Packet/September 1995), and Exhibit 21 (Request for Discharge Summaries, September 13 and 29, 1995).
2. The sanctions imposed have increased recruiting efforts for a developmental physician (testimony of Durbin, Akers, and Grunow) and for developmental nurses (testimony of Grunow and Womack), and have contributed to the retention of a Director of Nursing (testimony of Cardwell), a full-time psychiatrist (Dr. Askins), two developmental nurse consultants, and one developmental nurse (Ex. 28, Hr'g, October 10, 1995). See Compliance Chart, Appendix 7.
3. Sanctions have resulted in the completion of a relatively high percentage of the remedial provisions of the Emergency and Preliminary Injunction when compared with the compliance percentage for the Stipulated Remedial Order as evidenced by the First Semi-Annual Compliance Review. See Tr., Hr'g, April 10, 1995 (compliance with only five of sixty-five requirements of Stipulated Remedial Order); See also Compliance Chart, Appendix 7; Tr., Hr'g, October 27, 1995.

V.

A. FINDINGS REGARDING PURGATION OF CONTEMPT AND COMPLIANCE/NONCOMPLIANCE WITH REMEDIAL
There is no dispute that the defendants have now fully complied with two of the five provisions which were the subject of the Contempt Order of August 24, 1995. As of August 14, 1995, Dr. Askins was employed as a full-time psychiatrist at ADC; thus, paragraph 5 of the Emergency Order and Preliminary Injunction has been satisfied. See Compliance Chart, Appendix 7. Similarly, contracts have been executed with two developmental nurse consultants, Karen McGowan and Carolyn Smith. With the execution of the second consulting agreement on August 23, 1995, the defendants complied with paragraph 7 of the Emergency Order and Preliminary Injunction. Tr., Hr'g, October 10, 1995, at 82; Ex. 28, Hr'g, October 10, 1995; see Compliance Chart, Appendix 7.
Conversely, the State of Tennessee concedes that it has not complied with paragraph 2 of the Emergency Order and Preliminary Injunction. Tr., Hr'g, October 11, 1995, at 226 ("[W]e are not asserting compliance with paragraph 2").[36] Thus, the only two paragraphs as to which there is a dispute regarding compliance are paragraphs 1 (retention of a full-time developmental physician) and 8 (hiring of 136 nurses).
As previously stated, "the test for compliance by the defendants is whether the defendants took all reasonable steps within their power to comply with the Court's order." Glover v. Johnson, 934 F.2d 703, 708 (6th Cir.1991). When a contemnor has taken part in shaping the order, generally courts have been unsympathetic to reasons asserted for less-than-substantial compliance. See Spallone v. United States, 493 U.S. 265, 276, 110 S.Ct. 625, 632-33, 107 L.Ed.2d 644 (1990); Glover, 934 F.2d at 708-709.
In this case, the requirement for retention of a developmental physician was first incorporated by the State of Tennessee in the Stipulated Remedial Order of September 2, 1994. See Stipulated Remedial Order, *1312 docketed September 2, 1994, § VIA. Under the remedial plan, the State of Tennessee agreed to retain a developmental physician by March 1, 1995. At the hearing on the First Semi-Annual Compliance Report, on April 10, 1995, the State of Tennessee acknowledged that it has failed to meet its March 1, 1995, deadline, but advised the Court that a developmental medicine physician had been retained and would report by June 1, 1995. A third deadline for retention of a developmental medicine physician was established at the emergency telephone hearing on June 30, 1995.
The State of Tennessee, having agreed to obtain a developmental medicine physician for ADC and having incorporated that provision into the agreed upon remedial plan, should not be allowed to avoid an obligation for which it bargained as part of the settlement of this case. The presence of a developmental medicine physician at ADC is essential to the successful implementation of the remedial plan. Furthermore, from the record, it is clear that the defendants should not be excused from compliance with paragraph 1. Therefore, defendants remain in contempt as to that paragraph.
While the State of Tennessee remains out of compliance regarding the requirement of a developmental medicine physician, that does not resolve the issue of whether the full remedial and coercive sanctions imposed on the State to achieve compliance should remain in effect. That question should be considered in light of the extent of the State's efforts since the imposition of sanctions and the extent of the State's success in achieving compliance as to the remaining provisions of the Emergency Order and Preliminary Injunction.
Whether the State has purged itself of contempt regarding paragraph 8 must also be determined. The dispute as to paragraph 8 relates to a construction of the language of that paragraph, and requires an examination of the history of the formulation of that paragraph and the testimony of witnesses regarding the requirement for 136 nurses at ADC.
Once again, the origin of that paragraph rests in the Stipulated Remedial Order. Unlike paragraph 1, however, the Remedial Order did not require a specific number of nurses but only required that ADC have a sufficient number of nurses to meet the purposes of the Remedial Order. See Stipulated Remedial Order, docketed September 2, 1994, § II.A. The State of Tennessee did, however, propose a requirement of 136 nurses in the Plan of Correction drafted jointly with the United States and submitted as Exhibit 6 at the hearing of April 10, 1995. The applicable language of paragraph "II. C.1" is as follows:

Defendants shall have 136 nursing positions by April 14, 1995. These nurses will be on staff by July 1, 1995. Contract nurses will be utilized to fill vacancies, but will not serve on nutritional management teams or provide the functions set out in paragraph 1 above. Defendants will make ongoing efforts to fill these positions with Arlington nurse employees, rather than contract nurses. It is anticipated that this number of nursing positions will decrease depending on the number and characteristics of the residents.
Plan of Correction, Ex. 6, Hr'g, April 10, 1995, Paragraph II.C.1.
Gaye Hansen, the Facilitator of the Remedial Plan at ADC, clarified the meaning of subparagraph "C" in her testimony on April 10, 1995. Tr., Hr'g, April 10, 1995, at 68; see supra pp. 1297-1298. It is clear from Ms. Hansen's testimony that the Plan of Correction, as presented to the Court, contemplated the hiring of ADC nurse employees to fill the 136 nursing positions approved by the State of Tennessee. Ms. Hansen made this doubly clear when she testified that, "in the interim," positions would be filled with agency or contract nurses. The clear meaning of Ms. Hansen's testimony was that agency or contract nurses would be employed only until state nurse employees could be hired. This is consistent with the memorandum of Dr. Akers to Dr. Durbin dated March 14, 1995, in which Dr. Akers observed that "optimum coverage [136 state nurse employees] would end the incessant `Agency Nurse' emergency coverage, which is very expensive." Ex. 23, Hr'g, October 10, 1995; Appendix 3. Dr. Akers' memorandum is also conclusive on the *1313 point that the 136 state nurse employees include nurse administrators.
The State of Tennessee's own summary records clearly show that the 136 positions to which the Plan of Correction referred are Tennessee nurse employee positions. See Appendix 2. There is no credible evidence to suggest that, at any point, agency nurses were considered satisfactory to fill the positions created by the State of Tennessee in response to the Plan of Correction. Tr., Hr'g, April 10, 1995, at 65; Ex. 23, Hr'g, October 10, 1995; see supra notes 20-23. Moreover, even if contract nurses should be included in the calculation of 136 nurses (which they should not), under no construction of the information contained in Appendix 2, after removal of the Med Temps nurses as agency nurses, see supra note 23 and accompanying text, could the State be in compliance with the requirement for 136 Arlington employee nurses.[37] According to the plain language of paragraph 8 and applicable legal principles, it is clear that the State of Tennessee has failed to comply with paragraph 8 of the Preliminary Injunction and Emergency Order.
The effect of the State's hiring of essentially temporary individuals in larger numbers arguably reduced the adverse impact on ADC's residents of the State's failure to comply with its own remedial provision. This fact, just as the State's efforts to obtain developmental physician services, mitigates somewhat in favor of a modification of the coercive and remedial sanctions imposed in connection with these provisions.
The record also reflects, however, that the State has been less than diligent in achieving prompt compliance with other provisions of the Emergency Order and/or Preliminary Injunction. See Compliance Chart, Appendix 7, ¶¶ 6, 9, 14. Specifically, the State has not been successful in achieving compliance with the requirement for two developmental nurses. The State has hired only one developmental nurse (Ex. 3, Hr'g, October 10, 1995). Moreover, to fill the developmental nurse slot, the State attempted to hire one individual solely for the purpose of having a person in that position even though the State admitted that the proposed person was not qualified for the position. Tr. August 23, 1995, at 21 (candidate did not meet minimum requirements in State's own advertisement for position). Moreover, the State met the August 30, 1995, deadline (paragraph 9) for agreements with hospitals as to only one out of three hospitals and submitted no monthly report for the month of July 1995, as required by paragraph 14 of the Preliminary Injunction.
It is extremely difficult to understand why the State has been unable to marshal its resources and achieve relatively simple ministerial tasks such as the filing of reports and the negotiation of hospital agreements in a timely and effective manner. It is even more troubling that the State entered into an important agreement  the agreement with Columbus Medical Services for interim developmental medicine physicians  without considering basic questions such as the need of those physicians to be licensed in Tennessee (so that they can practice in Tennessee) and the need to have those physicians available for team consultations (just as the remedial plan required that a retained developmental physician be available). See Contempt Order, note 11. No explanation has been offered by the State, other than the explanation contained in Appendix 6, regarding why a competent administrator would overlook such obvious and important steps.
Furthermore, the lack of urgency by State administrators, in light of the demonstrated life threatening risks posed by their inaction, is disturbing. For example, Commissioner Cardwell testified that she did not meet with the administrators on her second weekend at Arlington because they had been "working steady five days a week." Tr. Hr'g, October 10, 1995, at 211. At the same time, she acknowledged that the institution still does not have an overall plan for implementation *1314 of the remedy. Id. at 214. Commissioner Cardwell blamed that lack of an overall plan on a lack of responses from "consultants" but identified no effective efforts made to expedite those responses or to work with administrators on an alternative strategy to complete a plan for implementation and to actually implement the State's own plan of corrective action.

B. WHAT ARE THE BEST AND LEAST INTRUSIVE REMEDIAL SANCTIONS AVAILABLE?
The $1,000.00 a day fines as to the paragraphs as to the which the State is not in compliance are not seriously contested. The State does not argue that those sanctions are inappropriate but only argues that as to two (2) of the paragraphs they are in "partial compliance" and that the sanctions are no longer necessary. As previously noted, however, Courts are particularly unsympathetic to excuses for less than substantial compliance where the contemnor has participated in drafting the order against which compliance is measured. See Glover v. Johnson, 934 F.2d at 708-09. The fines imposed as to paragraphs 1, 2, and 8 should, therefore, remain in effect until the State of Tennessee achieves compliance.
The more troubling question is whether or not the requirement that Commissioner Cardwell spend every fourth weekend at Arlington Developmental Center until compliance is achieved should remain in effect.[38] It is clear from the testimony of Dr. Akers that he has made substantial efforts since the imposition of sanctions to improve the delivery of patient care at Arlington Developmental Center. It is also clear that the retention of Director of Nursing Lester has been an important step in improving nursing services at Arlington Developmental Center. The retention of at least one developmental nurse and of two developmental nurse consultants and the utilization of developmental physicians from Columbus Medical Services, despite serious missteps in the initial contract negotiation, all represent much needed change at Arlington Developmental Center.
Commissioner Cardwell has testified that she is "the chief executive officer with the State responsible for complying with the [Remedial Order]." Tr. April 10, 1995, at 104. When specifically asked against whom sanctions should be imposed for failure to comply, Commissioner Cardwell has insisted that she is the responsible party. Tr., Hr'g, July 10, 1995, at 83. Based on her insistence, the Court has directed remedial sanctions against her. Contempt Order, docketed August 24, 1995.
It is unclear, however, whether the Commissioner, despite her assertion that she is the chief executive officer for the State of Tennessee for Arlington Developmental Center, is involved in the day-to-day operations at ADC.[39] From her testimony, it appears that she is far more familiar with other institutions run by the State of Tennessee and that, in fact, her visits to Arlington Developmental Center have served as an orientation for her to that facility. Tr., Hr'g, October 10, 1995, at 210. A substantial question exists regarding the identity of the person or persons against whom creative sanctions would be most effective in achieving the remedial purpose of the orders in this case. Neither the United States nor the State of Tennessee (nor People First nor the Parent-Guardian Association) have briefed all of the creative alternatives[40] which may be available *1315 to the Court in lieu of the relatively simple, though highly effective sanction imposed.
The United States strongly argues that the Court should continue the only sanction which has been effective in achieving efforts towards compliance by the State of Tennessee. Undoubtedly, the requirement that the Commissioner spend every fourth weekend at Arlington Developmental Center initially was a very effective remedial sanction. It is equally clear, however, that since it appears the State may have made a deliberate decision to change its course and not comply with the Remedial Order, Plan of Correction, and Preliminary Injunction, a more comprehensive sanction scheme, tailored to assure compliance in this complex environment would be useful.
The United States shall, therefore, submit within thirty (30) days of the entry of this order a comprehensive legal analysis of the remedies available for use in this case, including a proposed remedial sanction scheme. The State of Tennessee likewise may, but is not required to, submit its own proposed remedial sanctions scheme and the authorities supporting it. Likewise, the intervenor and class representative, People First, and intervenor Parent-Guardian Association may, but are not required to, submit within thirty (30) days such a proposal. Any party may file a response to the initial filings of those parties submitting proposed remedial sanctions within fifteen (15) calendar days of the filing by the United States.
The Court will then consider whether or not it should adopt, as part of the remedies available in the context of contempt as to the Preliminary Injunction (and the Contempt Order of August 24, 1995) any or all of the proposed remedial sanctions. The remedial sanctions proposals may also be considered as possible additions to the Remedial Order. The parties should focus on the problems enunciated in note 10 regarding how to require government administrators to be responsive and the degree to which individual government administrators may be personally sanctioned.
As an interim step, in lieu of the requirement that Commissioner Cardwell spend every fourth weekend at Arlington Developmental Center,[41] four (4) key administrators, Medical Director Akers, Superintendent Jackson, Director of Nursing Lester, and Remedial Order Facilitator Hansen, are required to be available one day a month at Arlington Developmental Center for transcribed group and/or individual question and answer sessions. The Monitor may request the presence of additional persons at these sessions.
The sessions will focus on implementation not only of the Preliminary Injunction but also of the Remedial Order and Plan of Correction. The first question and answer session shall be scheduled within three (3) weeks of the date of entry of this order.[42] If satisfactory with the Monitor, the parties may schedule the session for a weekend date if they conclude that such a schedule would least interfere with operations of the institution.
SO ORDERED.
NOTES
[1] Since the Court's Order of August 24, 1995, there have been two deaths at ADC. See Appendix 1. There have been no admissions to ADC since the adoption of the remedial plan on September 2, 1994.
[2] The total budget for ADC for 1995 is approximately $39 million of which approximately $26 million is paid by the federal government. Tr., Hr'g, April 10, 1995, at 190 11. 2-4. ADC is funded under a series of ninety (90) day extensions obtained through the federal Health Care Financing Administration ("HCFA"). The State of Tennessee is currently pursuing a proposal with HCFA for inclusion of State services for the mentally retarded under TennCare. The State is actually pursing two (2) waivers  an 1115 waiver (known as a "TennCare" waiver) and a 1915 C waiver (known as a home and community based waiver). Id. at 155-156. The State anticipates that developmentally disabled individuals will be included in the TennCare program as of January 1, 1996. Id. at 174 (the goal of the State is to convert the residential and services component for this population into TennCare).
[3] In Youngberg v. Romeo, the Supreme Court considered the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment of the United States Constitution. 457 U.S. 307, 314, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982). The Supreme Court found that "[w]hen a person is institutionalized and wholly dependent on the state ... a duty to provide certain services and care does exist...." Id. at 317, 102 S.Ct. at 2459. Under the Due Process Clause of the Fourteenth Amendment, the State has:

a duty to provide adequate food, shelter, clothing and medical care. These are the essentials of the care that the state must provide. The State also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution ... [Residents enjoy] constitutionally protected interests in the conditions of reasonable care and safety, reasonable non-restrictive confinement conditions, and such training as may be required by these interests.
Id. at 324, 102 S.Ct. at 2462; see also Collins v. City of Harker Heights, Texas, 503 U.S. 115, 127, 112 S.Ct. 1061, 1069-70, 117 L.Ed.2d 261 (1992) ("Due Process Clause of its own force requires that conditions of confinement satisfy certain minimum standards ... for persons in mental institutions").
[4] Dr. O'Neall had previously served by agreement of the parties as the Expert Facilitator in assisting the parties in negotiation of the remedial plan and in drafting alternatives for a court-imposed plan should the parties not reach agreement. Of course, because the parties reached agreement, no plan was imposed by the Court.
[5] The implementation schedule contains approximately 103 deadlines for more than 150 requirements. The deadlines vary from actions to be taken "immediately" (i.e., beginning as of September 1, 1994) to some actions to be completed 36 months from the plan commencement date. For example, nurse staffing pursuant to paragraph "II.A." was to be completed within three months (i.e., by December 1, 1994). Similarly, a chief psychologist (paragraph "II.B.") and staff psychologists (paragraph "II.C.") were to be retained within three months (i.e., by December 1, 1994). A psychiatrist (paragraph "II.E.") was to be retained within thirty days (i.e., by October 1, 1994). A Developmental Medicine Physician (paragraph "VI.A.") was to be retained within six months (i.e., by March 1, 1995). The effectiveness of certain provisions was dependent on timely completion of other provisions. For example, various committees were to begin to function within specified periods of time and the functioning of those committees was dependent upon the professionals being retained within the timeline set out in the agreed-upon implementation schedule. See, e.g., paragraph III.L. (Behavior Management Committee, beginning at six months; i.e., March 1, 1995).
[6] The record reflects that as of April 10, 1995, the Commissioner had not read the November 22, 1993, findings of the Court. See Tr., Hr'g, April 10, 1995, at 115 ll. 9-12. The State, therefore, included in its Plan of Correction a requirement that the Commissioner of Mental Health/Mental Retardation and certain other senior administrators at ADC and the State central office: "Must certify within thirty (30) days that they have read, in their entirety, the Court's Opinion, Preliminary Injunction, Findings of Fact, Remedial Order, and Monitor's Compliance Report." Plan of Correction, Ex. 6, ¶ V, Hr'g, April 10, 1995.
[7] As of June 30, 1995, only 106 nurses were working at ADC; this number included not just "Arlington nurse employees" as specified by the Plan of Correction but also contract and agency nurses. Compare Tr., Hr'g, July 10, 1995, at 94 (Commissioner Cardwell) with Ex. 4, Hr'g, October 10, 1995 (ADC Nursing Status, August 11, 1995); see also Appendix 2. While the number of nurses employed at ADC as of the date of the April 10, 1995, Plan of Correction was not the subject of proof at that hearing, a memo by Dr. Phillip Akers, ADC Medical Director, shows that on March 14, 1995, ADC employed a total of 98 nurses. Ex. 23, Hr'g, October 10, 1995; Appendix 3. Thus, between March 14, 1995, and June 30, 1995, ADC obtained the services of only an additional eight nurses.
[8] The remedial provisions of the June 30, 1995, Emergency Order (docketed July 3, 1995) had been drafted with the participation of the parties, and were telecopied to the Court for review prior to the telephone conference. Tr., Hr'g, June 30, 1995, at 14 ll. 1-4. The State expressly agreed that the situation required the proposed emergency remedial steps and asserted that the State had "already begun to take steps to put those measures in place." Tr., Hr'g, June 10, 1995, at 15 11 12-14; Tr., Hr'g, June 30, 1995, at 35-36. Other than extending the deadline for obtaining a Developmental Medicine Physician by two days (to July 5, 1995), the Court made no changes in the proposed remedial action or deadlines. See Tr., Hr'g, June 30, 1995, at 39.
[9] A portion of the transcript was sealed after a request by counsel for the State of Tennessee that counsel be allowed to make certain disclosures under seal. The United States agreed with that request and the Court indicated that subsequent portions of the transcript would be placed under seal subject to a later motion that the materials be unsealed.

The Court has carefully considered its obligations in connection with the material submitted under seal prior to the hearing of August 9, 1995. A judge is obligated to follow the law. Therefore, in this case, it would be inappropriate for the Court to unseal the sealed portions of the August 9, 1995, transcript.
At the same time, the material disclosed to the Court is not "extrajudicial information" but, rather, is information disclosed properly during the course of a proceeding and is information on which the judge may rely, along with all of the other information in the record, in reaching conclusions. The Court has carefully considered whether the disclosures constitute evidence of a offer of compromise which would be excludable as evidence pursuant to Rule 408 of the Federal Rules of Evidence. From the transcript, it does not appear that Rule 408 is applicable. Tr., Hr'g, August 9, 1995, at 9 ll. 16-17 (Maloy). Moreover, even if applicable, the information submitted may be considered for purposes of establishing bias or motive. Fed.R.Evid. 408.
In the Contempt Order of August 24, 1995, it was not necessary to consider the implication of the fact disclosed by the State in the sealed portion of the transcript. TWM Mfg. Co. v. Dura Corp., 722 F.2d 1261, 1273 (6th Cir.1983) (holding that there is no intent requirement for civil contempt). The disclosure of the State, however, is relevant on the issue of purgation of contempt and any assertion of impossibility (or good faith) by the defendant, as well as on the issue of the continued necessity of coercive and remedial sanctions. See United States v. Work Wear Corp., 602 F.2d 110 (6th Cir.1979).
In that context, it should be noted that based on the information submitted under seal by the State of Tennessee on August 9, 1995, it appeared that the State, at least as of that date, no longer intended to implement the agreed upon remedy at ADC. Tr., Hr'g, August 9, 1995, at 9 ll. 16-17, 23 ll. 19-25 (under seal at the request of the State).
[10] Achieving accountability and responsiveness by governmental entities and officials poses special problems for courts in fashioning civil coercive and remedial sanctions for failure of those officials and entities to comply with Court orders. While private individuals and corporations may be highly motivated by the prospect of significant financial losses since the financial fates of individuals and their businesses are closely tied, public officials are, in many respects, essentially independent from the effect of financial losses imposed on the governmental entity by whom they are employed.

Moreover, in dealing with publicly funded entities, fines are often an indiscriminate and potentially counterproductive means of enforcing compliance. Thus the value of fines in forcing a governmental entity to comply with either an agreed upon or imposed court order is often largely symbolic and generally must be narrowly crafted in order to avoid impairing the ability of the governmental entity to perform the tasks required by the order. Moreover, public policy concerns regarding the possible impairment of delivery of important social services dictate that special attention be given to craft remedies that in fact require the public official and governmental entity to perform his or her or its function as opposed to penalizing innocent taxpayers and individuals in need of critical public services.
[11] The full text of the Emergency Order and Preliminary Injunction are set out in Appendices 4 and 5 respectively. Other provisions under the Emergency Order and Preliminary Injunction have now also become due and are discussed infra pp. ___ - ___. See Appendices 2, 3, 7.
[12] There are two kinds of contempt: civil and criminal. Criminal contempt may be used by a court to punish a contemnor and vindicate the authority of the court. International Union, United Mine Workers of Am. v. Bagwell, ___ U.S. ___, ___, 114 S.Ct. 2552, 2557, 129 L.Ed.2d 642 (1994); Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911). Criminal contempt proceedings, however, entitle the contemnor to certain constitutional protections associated with other criminal cases. See Hicks v. Feiock, 485 U.S. 624, 632, 108 S.Ct. 1423, 1429-30, 99 L.Ed.2d 721 (1988).

Thus, it is important to distinguish between the two types of contempt. Given that either fine or imprisonment may be used as a sanction for either type of contempt, it is the "character and purpose" of the punishment that differentiates civil from criminal contempt. Gompers, 221 U.S. at 441, 31 S.Ct. at 498. When the sanction is punitive, the contempt proceeding is criminal in nature; when the sanction is coercive or remedial, the contempt proceeding is civil in nature. See Hicks, 485 U.S. at 632, 108 S.Ct. at 1429-30; Gompers, 221 U.S. at 442, 31 S.Ct. at 498 ("[I]mprisonment for civil contempt is ordered where the defendant has refused to do an affirmative action required by the provisions of an order which, either in form or substance, was mandatory in character").
[13] This Court has found the State of Tennessee to be in civil contempt, and there appears to be no contention that this characterization is somehow incorrect.
[14] Whether a contemnor has complied with the court order for which it was held in contempt is a distinct inquiry from a finding of contempt. In a civil contempt proceeding, a finding of contempt must be based on clear and convincing proof that the alleged contemnor violated a prior order of the court. Glover v. Johnson, 934 F.2d 703, 707 (6th Cir.1991); see infra part III.B.2 (discussing the legal standard for judging compliance).
[15] In a contempt proceeding for failure to comply with a court order, the contemnor has a defense if it is factually impossible to comply with the order. United States v. Rylander, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552-53, 75 L.Ed.2d 521 (1983); Maggio v. Zeitz, 333 U.S. 56, 75-76, 68 S.Ct. 401, 411-12, 92 L.Ed. 476 (1948). The contemnor, however, has the burden of production with respect to this defense. Id.; but see United States v. Bryan, 339 U.S. 323, 330, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950) ("[O]ne charged with contempt of court for failure to comply with a court order makes a complete defense by proving that he is unable to comply") (emphasis supplied); Nabkey v. Hoffius, 827 F.Supp. 450, 453 (W.D.Mich.1993) (holding that the contemnor has the burden of proving inability to comply). Failure to comply with a court order will not be excused for "mere financial hardship." United States v. Work Wear Corp., 602 F.2d 110, 116 (6th Cir.1979). Further, a present inability to comply that results from the contemnor's own actions will not be a defense to contempt. United States v. Lay, 779 F.2d 319, 320 (6th Cir.1985) (holding no defense for "self-induced inability to comply" where "the defendant consciously and willfully placed himself in a financial status in order to avoid responsibility for complying with the court orders"); see also Bryan, 339 U.S. at 330-31, 70 S.Ct. at 730; United States v. Asay, 614 F.2d 655, 660 (9th Cir.1980).
[16] For the diligence efforts test rejected by this Circuit, see, e.g., Newman v. Graddick, 740 F.2d 1513, 1525 (11th Cir.1984) (holding that "a person who attempts with reasonable diligence to comply with a court order should not be held in contempt").
[17] Of the seven witnesses called by the defendants, four had no significant contact with ADC until after July 1, 1995. Grunow and Womack are state employees who became involved with recruiting at ADC after July 5, 1995, Askins began working as a psychiatrist at ADC on August 14, 1995, and Lester began working as Director of Nursing on September 15, 1995. Tr. Hr'g, October 10, 1995, at 23 (Grunow), 29 (Womack), 158 (Askins), 173 (Lester). Three witnesses with longer experience with ADC were called by the State: (1) an assistant Commissioner (Durbin), (2) the ADC Medical Director (Akers), and (3) a consultant (Palmer).
[18] The subject of who would employ a developmental physician (either the University of Tennessee or the State of Tennessee) and the applicable benefits package has been the subject of inquiry at hearings on July 10, 1995, and August 9, 1995. See Contempt Order, docketed August 24, 1995, at 8, 16.
[19] It is significant that, while the requirement for two developmental nurses was first included in the June 30, 1995, Emergency Order, and was repeated in the July 10, 1995, Preliminary Injunction, no advertisement was placed for these positions prior to August 9, 1995. A two week deadline was established at the August 9, 1995, hearing. The advertisements were then placed on August 17, 1995, and ran on August 20, 1995. It would appear that prior to August 9, 1995, the defendants did not intend to fill the developmental nurse positions. See Appendix 6.
[20] Specifically, Ms. Womack testified regarding the "different categories of nurses working at Arlington" as follows:

Q. Now, I see on that there are different categories of nurses working at Arlington?
A. Yes.
Q. What are those categories?
A. The categories are State employees, contract employees and agency employees.
Q. Okay. Will you please define for the Court what each one of those categories  who comprises each one of those categories?
A. Yes, ma'am. The category of State employee, of course, is those individuals that we have interviewed and employed as a full-time State employee that's assigned a full-time schedule at Arlington. The category of contract employee is made up to two agreements, that's the guardian health care group. The guardian health care group is a contract that furnishes full-time foreign nurses to Arlington to be placed in full-time regular schedule work. They have been with us since  1993 was the original contract. The other agency is the Med Temps. Med Temps is a placement agency that's a part of Memphis-Shelby County Medical Society. They place full-time transitional employees with us. Those nurses spend 190 days with us on a probationary status and then they can go into a  they apply to get on our State register and then they can go in for a full-time State position which is our goal for those nurses as well. The other category is agency nurses. The agency nurses are made up of three contractual arrangements. They are with nurse Express, Staff Builders and Clinicall. Those three agencies supply nurses that we are familiar with that we have requested by name that contract as a three-week renewable contract, but it is a three-week renewable contract because of funding limitations and funding requirements. Those nurses are placed on a monthly schedule, they work full-time, they show up for work just like the State employee and the contract employee do.
Q. Okay. Now, as far as the Med Temp nurses, on the August 11th report, were they listed as contract or agency employees?
A. They were listed as agency employees on August the 11th.
Tr., Hr'g, October 10, 1995, at 33-35 (emphasis supplied).
[21] See supra note 20.
[22] The Plan of Correction submitted by the State on April 10, 1995, was created based on the characterization of nurses at that time. Ex. 6, Hr'g, April 10, 1995. Thus, for purposes of complying with the Plan of Correction submitted by the State, Med Temps nurses should be counted as agency nurses.
[23] Appendix 2 shows that on September 8, 1995, 28 "agency" nurses were employed at ADC. On September 15, when the "agency" category was reduced by moving Med Temps nurses to the "contract" category, the remaining number of "agency" nurses was reduced to 16. See Appendix 2. Therefore, the number of Med Temps nurses, as of September 15, 1995, appears to have been 12. Subtracting the Med Temps nurses from the contract nurses for each reported period from September 15 to October 4, 1995, it is clear that, even under the defendants' theory, at no time between August 11, 1995, and October 10, 1995, was the State of Tennessee in compliance with the April 10, 1995, Plan of Correction, the June 30, 1995, Emergency Order, or the July 10, 1995, Preliminary Injunction. See supra note 22; see also Appendices 2, 6 (sealed portion of August 9, 1995, transcript).
[24] See supra pp. 1305-1306 (discussion of licensure of Columbus Medical Services physicians).
[25] The October 5, 1995, amendment also addressed another shortcoming of the original contract. Prior to the amendment, the physicians provided by Columbus Medical Services had not attended scheduled meetings with the other staff on a patient's team. See Tr., Hr'g, October 10, 1995, at 73-74; see also infra pp. 1308-1309. The pertinent provisions reads as follows:

Columbus Medical Services agrees that all DD physician consultations for persons who live at Arlington Developmental Center will include face-to-face meetings with members of the person's team and the person's primary care physician.
Ex. 7, ¶ A.2., Hr'g, October 10, 1995.
[26] The four primary care physicians, according to Dr. Akers, had "no prior experience whatever in the field of developmental disabilities." Tr., Hr'g, October 10, 1995, at 88.
[27] While all of these activities are not directly relevant to whether the defendants have purged themselves of contempt as to the five uncompleted provisions of the Emergency Order and Preliminary Injunction, they are relevant to efforts to achieve the overall remedial objective as set out in the Contempt Order. Contempt Order, docketed August 24, 1995, at 14.
[28] Dr. Akers described the contributions of the developmental physicians to improved care at ADC as "enormous." Tr., Hr'g, October 10, 1995, at 74 l. 13. According to Dr. Akers:

We're getting a holistic look at the medical care of these persons ... so we're evaluating people at a higher level than previously done. The value of the team is that this process is literally teaching the team how to do business. Now [physicians and nurse practitioners are] sitting down with a document written by a master physician, a developmental pediatrician addressing each of these issues. There could be no finer teaching tool for our staff medical providers than these consultations.
Id. at 74-75.
[29] See supra note 25 (discussing the October 5, 1995, amendment to the contract between the State of Tennessee and Columbus Medical Services to remedy the unavailability of the developmental physicians for team meetings).
[30] Dr. Akers also indicated that he and Commissioner Cardwell discussed his request for transfer to Cloverbottom, a Tennessee ICFMR facility located in Middle Tennessee. Tr., Hr'g, October 10, 1995, at 129.
[31] Dr. Askins is scheduled to attend a meeting of the National Association for Dually Diagnosed Persons in Allentown, Pennsylvania, as well as a conference sponsored by Columbus Medical Services in November in New Orleans, Louisiana. Tr., Hr'g, October 10, 1995, at 163. Dr. Askins does not have a background in behavioral psychology. Id. at 164.
[32] Commissioner Cardwell further explained that:

The implementation plan is not all complete because of not having concrete information back from some of the consultants with which the staff had worked.
Tr., Hr'g, October 10, 1995, at 217.
[33] During her weekend visits, Commissioner Cardwell investigated deficiencies cited by the Monitor and her developmental medicine physician, checked the activity schedules of residents to see if they were being maintained, observed the organizational structure at ADC, checked on operations during the second and third shift, and observed problems in nursing distribution. Tr., Hr'g, October 10, 1995, at 197, 202, 206-07, 208-09. One of the conclusions that Commissioner Cardwell reached as a result of her visits was that, "We had to have a top notch Director of Nursing as soon as possible." Id. at 197.
[34] Exhibit and testimony referred to in this subsection are exhibits and testimony introduced at the October 10, 1995, hearing unless otherwise noted.
[35] This was the first such current at-risk list developed. Tr., Hr'g, October 10, 1995, at 124.
[36] Linda Ross, counsel for the State of Tennessee stated in closing argument as follows:

Paragraph two, which sets out the duties of a developmental physician is linked, of course, to paragraph one, of course, requiring the permanent full-time physician and to paragraph six requiring developmental nurses by October 23rd. Without those persons, paragraph 6 cannot be fully satisfied, and we are not asserting compliance with paragraph two.
Tr., Hr'g, October 11, 1995, at 226.
[37] The apparent reason that ADC has not proceeded to hire 136 state employee nurses as required under the Plan of Correction and as required in the Emergency Order and Preliminary Injunction is contained in Appendix 6. See Tr., Hr'g, August 9, 1995, at 9 (under seal at the request of the State).
[38] The requirement that Commissioner Cardwell spend every fourth weekend at ADC is currently the subject of a stay by the Sixth Circuit Court of Appeals. Tennessee v. United States, No. 95-6185 (6th Cir. October 13, 1995). See National Labor Relat. Bd. v. Cincinnati Bronze, Inc., 829 F.2d 585, 588 (6th Cir.1987).
[39] It should be noted that the Superintendent at Arlington Developmental Center, Max Jackson, has yet to testify at any proceedings in this case. Mr. Jackson is charged with the day-to-day management of ADC and plays an important role in implementation of key provisions of the remedial plan.
[40] For example, creative alternatives might include a requirement of an administrator's off-hours schedule (to cover weekends, second and third shifts), imposition of an administrator to more closely monitor the day-to-day progress at Arlington Developmental Center, imposition of a direct administrative penalty or bonus system dependent on the percentage of compliance obtained with the overall Remedial Plan or Plan of Correction or Preliminary Injunction. Such types of alternatives should be considered not only in the context of defendants' contempt concerning the preliminary injunction but also at any later proceeding should the defendants be found in contempt concerning implementation of the Remedial Order or Plan of Correction.
[41] The requirement that Commissioner Cardwell spend every fourth weekend is removed.
[42] If the parties are unable to reach agreement regarding the first question and answer session, the Court will set a date and time. The Monitor will preside at each session. See Stipulated Remedial Order § XV B.5. and C. Each party and/or counsel may be present and may make inquiry and request documentation. Document requests and questions may be submitted in advance of the question and answer sessions (for information and documents to be produced at the session) or at the session itself (for information and documents to be produced at the session). A purpose of the sessions will be to facilitate information gathering by the parties. See Fed.R.Civ.P. 26.